FILED
COURT OF APPEALS
DIVISION II

2013 MAR -5 AM 9: 24

STATE OF WASHINGTON

BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In re the Estate of: | No. 42078-3-II |
| LARRY CAPPS, | |
| Deceased. | UNPUBLISHED OPINION |

PENOYAR, J. — After Larry Capps's death, his children from a previous marriage petitioned the trial court for a declaratory judgment that his home remained separate property and belonged to them under his will. Despite a lengthy marriage to Linda Capps, the trial court concluded that the family home remained Mr. Capps's separate property until his death. The trial court also rejected Mrs. Capps's claim for reimbursement of expenses related to the home and concluded that the marital community owed rent to Mr. Capps during his lifetime and that the rental obligation continued for Mrs. Capps during the time she resided in the home following Mr. Capps's death. Because Mr. Capps purchased the home before his marriage to Mrs. Capps, the trial court did not err by concluding that it was his separate property. Additionally, the trial court did not err by denying Mrs. Capps's reimbursement claims because she failed to prove that community funds were used to improve the home. We affirm.

Mr. Capps's estate's personal representative (PR) advised Mr. Capps's children, Larry and Kimberly,[1] and Mrs. Capps that the North Huson Street home's separate character had been commingled with the community over the course of 30 years such that it had become a community asset that Mrs. Capps would inherit under the terms of Mr. Capps's will, which left his separate property to his children and all community property to Mrs. Capps. The children filed a declaratory judgment action, asking the trial court to establish the home as their father's separate property. The trial court ruled on summary judgment that the home was Mr. Capps's separate property. Following the adverse summary judgment ruling, Mrs. Capps filed a formal creditor's claim, which the estate rejected.

Eventually, the trial court conducted a full trial on Mrs. Capps's reimbursement claims,[2] which the trial court rejected for lack of sufficient evidence. The trial court also imposed rent for the months Mrs. Capps resided in the home after Mr. Capps's death, offset this rent against the expenditures she made on the home during that same post-death period, and awarded attorney fees to the children. This appeal stems from the trial court's rulings relating to the character, disposition, and settlement of claims involving Mr. Capps's estate.

---

[1] For clarity, we refer to Mr. Capps's children from his first marriage—Larry A. Capps and Kimberly Scalera—by their first names. We intend no disrespect.

[2] While the 2007 probate action was still pending, Mrs. Capps's second attorney filed a separate action directly against the estate's PR and Mr. Capps's children in 2010, seeking equitable reimbursement for personal monies she had contributed to the home. The trial court consolidated Mrs. Capps's new reimbursement claim action with the 2007 probate action; this consolidation appears to have been the source of much confusion.

In March 2011, the trial court entered an order stating that the trial would focus on Mrs. Capps's equitable reimbursement claim, which was not a creditor's claim. The trial proceeded in the probate action with Mrs. Capps pursuing her claim against the estate for reimbursement of sums she claimed the estate owed her for contributions to the home. When the trial ended, the trial court dismissed Mrs. Capps's 2010 equitable reimbursement action because she had not supported her reimbursement claims with sufficient evidence.

Contending that the trial court was biased against her, Mrs. Capps argues on appeal that the trial court erred by (1) granting partial summary judgment to Larry and Kimberly on grounds that the home was Mr. Capps's separate property; (2) denying her motion for reconsideration of the court's characterization of the home as Mr. Capps's separate property; (3) denying her motion for leave to litigate the separate property issue at trial; (4) concluding that, as a surviving spouse, (a) she must file a creditor's claim against the estate before pursuing a claim for equitable reimbursement from the estate assets and (b) she could not pursue a "direct action" for equitable reimbursement against the estate PR and estate beneficiaries; (5) failing to consider applicable community property presumptions when ruling on her equitable reimbursement claim; (6) imputing rental value to her for the period she had lived in the home during her marriage to Mr. Capps and using this imputed rental value to offset her equitable reimbursement claim; (7) determining that her trial testimony was not credible; (8) admitting expert testimony about the home's value; and (9) awarding Larry and Kimberly attorney fees and costs for the trial court proceedings. Mrs. Capps also challenges several of the trial court's findings of fact and conclusions of law, and she requests that, if we reverse and remand for a new trial, we order that her case be assigned to a different trial judge.[3]

---

[3] Because we affirm the trial court's rulings below and see no indication that the trial court was prejudiced against Mrs. Capps, we deny her request for remand to a different judge.

## FACTS

### I. BACKGROUND

Mr. Capps and his previous wife had purchased a Tacoma residence on North Huson Street in July 1975. When they divorced a year later, Mr. Capps was awarded the home as his "sole and separate property." Clerk's Papers (CP) at 67. They had two children, Larry and Kimberly.

In August 1976, Mr. Capps's future wife, Linda Capps, began living with him in the North Huson Street home. They married in February 1977, after which they comingled their funds in joint bank accounts. They lived together in the home for 30 years until Mr. Capps's death in January 2007, at which point all their bank accounts were jointly owned, with Mrs. Capps designated as the sole surviving joint tenant.

#### A. Prenuptial Agreement and Quitclaim Deed

On February 22, 1977, Mr. Capps and Mrs. Capps signed a prenuptial agreement, which provided that (1) each person's then-existing separate property would remain his or her separate property after marriage and (2) all property acquired after marriage would be considered community property. Section four of this prenuptial agreement, however, further explained that all rents, issues, profits, income, and proceeds of separate property would be characterized as community property:

> Except for gifts and inheritances[,] *all rents, issues, profits, income or proceeds of property, including separate property owned before the marriage,* and property acquired jointly or as community property, shall be regarded as community property. The products of the parties' labor and their incomes shall be community property.

CP at 199 (emphasis added).

According to the prenuptial agreement, at the time of their marriage, Mrs. Capps owned only personal property.[4] Mr. Capps had (1) over $80,000 in separate bank accounts and an account receivable and (2) an interest in a real estate contract involving the North Huson Street home, valued at $50,000, on which he still owed $15,000. About two months after marrying Mrs. Capps, on April 21, 1977, Mr. Capps satisfied the $15,000 balance he owed on the North Huson Street home's real estate contract[5] and received a statutory warranty deed to the home.

Two weeks later, on May 6, Mrs. Capps executed a quitclaim deed, affirming that the North Huson Street home belonged to Mr. Capps as his "sole and separate property." CP at 64. The quitclaim deed further provided, "This deed is to confirm that said property *is and will remain the separate property* of [Mr. Capps]." CP at 64 (emphasis added).

B.      Mortgage; Marital Expenses

A week after Mrs. Capps executed the quitclaim deed, Mr. Capps borrowed $42,500 from a bank, using the home as security. He deposited the loan proceeds into a bank account that he shared jointly with Mrs. Capps; this money was spent during their marriage for "community purposes." Report of Proceedings (RP) (March 15, 2011) at 118. Title to the home, however, remained solely in Mr. Capps's name.

According to Mrs. Capps, she and Mr. Capps had taken out the $42,500 mortgage with hopes of fixing up the North Huson Street home for their retirement, and they had invested significant funds to refurbish the home, converting it from a triplex into a single family home.

---

[4] Mrs. Capps owned no real property. Although not mentioned in the prenuptial agreement, Mrs. Capps later asserted that she had deposited $22,750 in proceeds from the sale of her previous separate home into a bank account that she shared with Mr. Capps.

[5] The record does not show the source of the funds Mr. Capps used to pay off his real estate contract. But the $80,000 in his separate bank accounts at the time of his marriage to Mrs. Capps would have been more than sufficient to cover this $15,000 balance.

But Mrs. Capps did not know whether any of the mortgage loan proceeds had been used for these purposes. Nor had she retained any records of the cost of refurbishing or repairing the home or the source of funds used to make such improvements. Nevertheless, according to Mrs. Capps, for the next 14 years after Mr. Capps obtained this loan, she and Mr. Capps used community funds to pay the $350 monthly mortgage until they fully repaid it in 1991.

According to Mrs. Capps, in the late 1980s (1) she and Mr. Capps had been in a car accident, for which she had received a $75,000 personal injury settlement award in 1991, independent of Mr. Capps's $3,000 settlement award, and (2) she had used a portion of her separate award to pay off the home mortgage and to pay for other "home improvements." CP at 32. Mrs. Capps did not, however, produce any records showing that she had received such a settlement award, that she had kept her settlement award separate from the couple's joint bank accounts, or that her own settlement funds had actually been used to pay off the mortgage or to pay for any home improvements.[6]

Neither Mrs. Capps nor the marital community paid rent to Mr. Capps's separate estate during the 30 years that Mr. and Mrs. Capps had lived together in the home during their marriage (February 1977 through January 2007). But they did pay yearly property taxes on the home. The tax assessor's records showed that, between 1977 and 2006, the total amount of property taxes paid on the home was $101,434.72. Mrs. Capps had no records of the source of funds used for such payments.

C.    Mr. Capps's Will; Mrs. Capps's Post-Death Expenses

---

[6] The trial court did not find credible Mrs. Capps's testimony that these funds were her separate property and that the funds had been spent on Mr. Capps's separate property.

After Mr. Capps died on January 15, 2007, his will was probated. Mr. Capps's will, executed 28 years earlier on February 26, 1979, left his separate property to Larry and Kimberly and left his community property to Mrs. Capps. The North Huson Street home, valued at around $755,000 a year and a half after Mr. Capps's death, was the only significant separate property in the estate. In addition to receiving Mr. Capps's share of the community property, Mrs. Capps received between $800,000 and $900,000 in certificates of deposit and other non-probate assets.

Mrs. Capps continued to live in the North Huson Street home until September 2009, during which time she paid no rent to Mr. Capps's separate estate. Mrs. Capps provided documents showing that between February 1, 2007, and September 31, 2009, she paid $13,795.41 in property taxes, $2,502 in home insurance, $6,618.78 for new windows, $1,660.20 for a new deck, $350 for exterior painting, $50 for new door locks, and $400 for a new garage door opener.

## II.  PROCEDURE

After Mr. Capps's death, the estate's PR notified Larry and Kimberly that he believed the home had been "co-mingled" [sic] with community funds and had become community property that would pass to Mrs. Capps under the will; consequently, Larry and Kimberly would inherit nothing from their father. CP at 370.

### A.  Probate Action; Larry and Kimberly's Motion for Partial Summary Judgment

The PR initiated probate proceedings in superior court. Larry and Kimberly petitioned the trial court for a declaratory judgment that the home remained Mr. Capps's separate property and that it passed to them under his will, and they moved for partial summary judgment on the home's status as Mr. Capps's separate property.

They based their separate property argument on (1) Mr. Capps acquiring the home before he married Mrs. Capps; (2) Mrs. Capps quitclaiming her interest in the home to him; and (3) Mrs. Capps's deposition testimony that at the time of her quitclaim deed there were no community property agreements or other agreements that would have changed the home's character from separate to community property.[7] Mrs. Capps did not respond to Larry and Kimberly's summary judgment motion allegations; instead, she relied solely on a declaration and a memorandum that she had filed in an earlier proceeding on a different issue.[8] These documents did not mention Mr. and Mrs. Capps's prenuptial agreement or the effect that this agreement might have had on the home's separate or community property character.

The trial court granted partial summary judgment to Larry and Kimberly, concluding that the home was Mr. Capps's separate property and, therefore, had passed to Larry and Kimberly under Mr. Capps's will. The trial court also orally ruled that Mrs. Capps could potentially have a

---

[7] At the time of Mrs. Capps's deposition and the trial court's summary judgment hearing, she had apparently forgotten that she and Mr. Capps had signed a prenuptial agreement.

[8] Mrs. Capps had submitted these declarations in connection with an earlier motion to relieve her of rent obligations during the probate proceedings. She had requested an extension of time to file a memorandum in response to Larry and Kimberly's partial summary judgment motion and the trial court had granted her request, but she did not submit a memorandum by the extended new deadline.

claim for equitable reimbursement for the contributions she had made to the home from her separate funds and from community property funds.[9]

B.    Mrs. Capps's Motions to Stay, to Reconsider, and to Grant Equitable Lien

Mrs. Capps filed a motion to stay delivery and/or recordation of the deed, a motion to determine community property interest and terms of payment, and a motion for reconsideration and relief from judgment. In her reconsideration motion, she presented, for the first time, a copy of the prenuptial agreement, but she argued only that, under section four of the agreement, "everything worked on or paid for [on the home] after the date of marriage [was] community property."[10] CP at 131. The trial court denied Mrs. Capps's motions for reconsideration and to stay delivery and/or recordation of the deed transferring the home's title to Larry and Kimberly.

In her "Motion to Determine Community Property Interest and Terms of Payment," Mrs. Capps purported to assert a claim for equitable reimbursement for her separate and community property contributions to the home. CP at 122. Larry and Kimberly opposed the motion, arguing that (1) Mrs. Capps had not yet pleaded a claim for equitable reimbursement; (2) before

---

[9] The trial court orally ruled:

> *I'm not addressing what may be or may not be any equitable lien issue.* But, I agree that the law is clear, in my mind, that the time of the acquisition is separate property. . . . And [Mrs. Capps], you know, all these years, I understand, executed a Quitclaim Deed, confirming that [the home] is [Mr. Capps's] separate property. And I think that's the law.
>
> . . . .
>
> *You have your own claim. I'm not telling you what to do, but I think there is a claim [for equitable reimbursement], you know, an equitable lien.*

RP (Sept. 4, 2009) at 23 (emphasis added).

[10] Mrs. Capps did not argue that the prenuptial agreement should supplant the quitclaim deed, which she had filed two months later, expressly confirming that the home was Mr. Capps's separate property. Nor did she argue that the prenuptial agreement's mere existence should affect the trial court's view of her intent in executing the quitclaim deed.

she could assert an equitable reimbursement claim, she needed to file a creditor's claim with Mr. Capps's probate estate under RCW 11.40.010; and (3) because she had not yet filed a creditor's claim and the two-year statute of limitations had run under RCW 11.40.051, her motion should fail. The trial court denied Mrs. Capps's motion to determine community property interest and payment terms. But it ruled that (1) she was not "time barred" from filing a claim for equitable reimbursement protected by an equitable lien on the home and (2) she could file such claim within two weeks of this order denying her motion. CP at 385.

C.       Creditor's Claim, Action for Equitable Reimbursement, and Consolidation

In October 2009, Mrs. Capps apparently filed a creditor's claim with Mr. Capps's estate seeking "$755,000 or the current fair market value" of the home. CP at 389. The estate denied Mrs. Capps's creditor's claim. She then filed a separate civil action against the PR and the children to enforce the rejected creditor's claim. She later amended that action to include an equitable reimbursement claim against the PR and the children. Before trial, the court consolidated the civil action with the probate action. The parties also stipulated that the only issue at trial was Mrs. Capps's equitable reimbursement claim, which was not based on her previous creditor's claim.

Before trial on her equitable reimbursement claim, however, Mrs. Capps moved for leave to relitigate the home's character. She argued that (1) a partial summary judgment order is "interlocutory," (2) a trial court may revise such order at any time before trial, and (3) the trial court should allow her to introduce evidence of the home's community property character at trial because her previous counsel had failed to argue the legal significance of the prenuptial agreement and its importance to interpreting the legal effect of her subsequent quitclaim deed. CP at 414. The trial court denied this motion.

10

D.     Trial on Mrs. Capps's Equitable Reimbursement Claim

Mrs. Capps proceeded to a bench trial on her equitable reimbursement claim.  In her opening statement, Mrs. Capps asserted that she was entitled to reimbursement for "practically the value of the house" because of the length of time that had passed and the amount of money she had put into it.  RP (March 15, 2011) at 6.  On direct examination, Mrs. Capps testified as summarized earlier in this opinion, without producing documentation to support many of her assertions that she had spent her separate property or community property funds on improvements to the home.  On cross-examination, she also testified that (1) the marital community, not Mr. Capps's separate estate, had received the full benefit and use of the $42,500 proceeds from his home loan; (2) she and Mr. Capps had used the money for community purposes, and it had enabled them to acquire over a million dollars in assets during their marriage; (3) she did not know if any of the loan money had been used to refurbish the home; and (4) because the marital community had received all of the loan money, it had been fair for the community to repay the mortgage.

Real estate appraiser Tim Richmond testified about the reasonable rental value of the home during the time that Mrs. Capps had lived in it during her marriage to Mr. Capps and after his death, from 1977 to 2009.  Without objection from Mrs. Capps, Richmond testified that (1) the total rental value of the home from 1977 to 2009 was $322,000; (2) the average monthly rent for that period would have been $840; and (3) the reasonable rental value of the home for the two and a half years between Mr. Capps's death in January 2007 and Mrs. Capps moving out of the home in November 2009 was $1,500 a month.

The trial court found "not credible" Mrs. Capps's testimony about selling her separate home for $22,750, bringing the proceeds into the marriage, using them for community purposes, and using her $75,000 personal injury settlement award, which was "solely for [her] pain and suffering," to repay the $42,500 North Huson Street home mortgage. CP at 584-85. The trial court concluded that the evidence Mrs. Capps had presented at trial was insufficient to sustain her claimed right to reimbursement because (1) Mr. Capps had brought more than $80,000 in separate property into the marriage, which was enough to pay the home's then-existing obligations on his separate real estate contract on the home and to compensate the marital community for any contributions toward the new $42,500 post-marriage home mortgage; (2) Mr. Capps had taken out the $42,500 mortgage for the community's benefit, so no right to reimbursement would have arisen even if community funds had been used to repay the mortgage; and (3) the marital community had received the benefit of living in the home rent-free during the marriage, representing a rental value of $286,560, which fully offset any community contributions that may have been made to the home.

The trial court dismissed Mrs. Capps's equitable reimbursement claim for her separate and community property contributions to the home during marriage. The trial court then calculated the amount of funds that Mrs. Capps proved that she had expended on the home *after* Mr. Capps's death, offset this amount against Mrs. Capps's rent for this post-death period, and awarded Larry and Kimberly attorney fees and costs. The trial court entered a final judgment against Mrs. Capps, ordering her to pay (1) $25,084 in rent for the period she had lived in the home after Mr. Capps's death, from February 1, 2007, to September 30, 2009; (2) $60,704.70 for Larry and Kimberly's reasonable attorney fees; and (3) $1,338.40 in miscellaneous fees and costs.

Mrs. Capps appeals.

## ANALYSIS

I.   SEPARATE PROPERTY CHARACTER OF MR. CAPPS'S HOME

The primary focus of several of Mrs. Capps's arguments is a challenge to the trial court's (1) reliance on two written documents expressly retaining the marital home's character as Mr. Capps's separate property—the parties' prenuptial agreement and Mrs. Capps's quitclaim deed to Mr. Capps—and (2) refusal to consider later raised extrinsic evidence of Mrs. Capps's alleged contrary intent. These arguments fail.

Mrs. Capps argues that the trial court erred by ruling that the home was Mr. Capps's separate property in three contexts: entry of the partial summary judgment, denial of her motion for reconsideration, and denial of her motion for a trial on the issue. We find no error in the trial court's ruling in any of the contexts because the overwhelming evidence was that the Huson Street house was Mr. Capps's separate property.

We begin by recognizing basic Washington community property law principles and presumptions. The character of property as separate or community property is determined at the date of acquisition, and it depends on whether it was acquired by community funds and community credit or by separate funds and separate credit. *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009); *Cummings v. Anderson*, 94 Wn.2d 135, 139, 614 P.2d 1283 (1980). "Under the 'inception of title' theory, property acquired subject to a real estate contract or mortgage is acquired when the obligation is undertaken." *Borghi*, 167 Wn.2d at 484. Once the separate character of property is established, we presume that the property remained separate property absent "direct and positive evidence to the contrary." *Borghi*, 167 Wn.2d at 484 (citing *Guye v. Guye*, 63 Wash. 340, 352, 115 P. 731 (1911)). Any increase in value of the separate

13

property is also presumed separate property. *In re Marriage of Elam*, 97 Wn.2d 811, 816, 650 P.2d 213 (1982).

To overcome these presumptions, a party must present clear and convincing evidence that the party owning the separate property intended to change its character from separate to community property. *Borghi*, 167 Wn.2d at 484-85, 490. Where, as here, real property is at issue, an acknowledged writing, such as a quitclaim deed or a community property agreement, is generally required to change the property's character. *Borghi*, 167 Wn.2d at 485. Later community property contributions to pay separate property obligations, improvements, or mortgages *may* give rise to a community "right [to] reimbursement" protected by an equitable lien, but such later actions do not change the property's character from separate to community. *Borghi*, 167 Wn.2d at 491 n.7.

Here, undisputed evidence showed that Mr. Capps had purchased the home and had acquired its associated real estate contract obligations before his marriage to Mrs. Capps. Absent a showing of direct and positive evidence to the contrary, the home and its later increased value, therefore, were presumptively Mr. Capps's separate property. The prenuptial agreement was consistent with the home's continuing separate property character. Mrs. Capps had the opportunity to offer evidence of Mr. Capps's intent that the home or its increased value should instead be community property. She presented no such evidence. Nor did she attempt to counter Larry and Kimberly's summary judgment motion assertions, which had included excerpts of her deposition testimony denying the existence of any community property agreements or another written transfer of Mr. Capps's separate property to her. Because Mrs. Capps failed to present evidence overcoming the effect of the prenuptial agreement or the presumption that the home and its increased value were Mr. Capps's separate property, we hold that the trial court did not

14

err in granting partial summary judgment to Larry and Kimberly or in denying Mrs. Capps's motions for reconsideration and to try the issue.

II.    CREDITOR'S CLAIM; EQUITABLE REIMBURSEMENT CLAIM

Mrs. Capps next argues that the trial court erred by concluding that Washington law does not recognize a "direct action" for a surviving spouse's equitable reimbursement claim and by dismissing her claim on the ground that she needed to file a creditor's claim with the estate before bringing her independent equitable reimbursement lawsuit. Despite questions raised about the necessity for and timeliness of the creditor's claim, the parties eventually went to trial on Mrs. Capps's underlying equitable reimbursement claim. We first address whether Mrs. Capps was required, under these facts, to file a creditor's claim. We then address the merits of Mrs. Capps's equitable reimbursement claim.

A.    Necessity of Creditor's Claim

Mrs. Capps argues that the trial court erred when it concluded that she was required to file a creditor's claim in order to receive equitable reimbursement. Because the claim did not arise until Mr. Capps's death, we agree.

The creditor's claim statutes, chapter 11.40 RCW, apply to persons with claims against a decedent. To constitute a claim against a decedent, a debt must be incurred by or for the decedent during his lifetime. *Olsen v. Roberts*, 42 Wn.2d 862, 865, 259 P.2d 418 (1953) (quoting 3 BANCROFT'S PROBATE PRACTICE 512, 526 (2d ed.)). It is unnecessary to file a creditor's claim with an estate when the claim did not arise until after the decedent's death. *Foley v. Smith*, 14 Wn. App. 285, 294, 539 P.2d 874 (1975). "[T]he filing of a creditor's claim is not a condition precedent to an action by a former spouse to recover his or her share of

15

community property accumulated during the marriage." *Smith v. McLaren*, 58 Wn.2d 907, 909, 365 P.2d 331 (1961).

Here, Mrs. Capps's equitable reimbursement claim is not a debt of Mr. Capps. Mrs. Capps's right of reimbursement did not arise until after Mr. Capps died. This action is an attempt to recover what Mrs. Capps believes is community property. A creditor's claim is not necessary in such a situation. *See Smith*, 58 Wn.2d at 909; *Witt v. Young*, 168 Wn. App. 211, 218, 275 P.3d 1218 (2012).

B.      Equitable Reimbursement Claim

Mrs. Capps argues that the trial court erroneously calculated her reimbursement amount and concluded that she had failed to introduce sufficient evidence at trial to prove her equitable reimbursement claim. We disagree. Mrs. Capps challenges the trial court's conclusions that she was not entitled to equitable reimbursement for the following expenses: (1) repayment of the $15,000 balance on Mr. Capps's separate real estate contract, (2) repayment of later $42,500 mortgage loan secured by the home, (3) property taxes paid for the home during marriage, and (4) her proportionate share of the home's increased value from inflation/market factors.

We review a trial court's decision to recognize a right to reimbursement protected by an equitable lien to determine if the trial court exercised its discretion in a manifestly unreasonable manner or exercised it on untenable grounds or for untenable reasons. *In re Marriage of Miracle*, 101 Wn.2d 137, 139, 675 P.2d 1229 (1984); *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). The person alleging a right to reimbursement has the burden of proving by clear and convincing evidence both the existence of that right and the claimed reimbursement amount. *See Elam*, 97 Wn.2d at 816-17; 19 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW: REIMBURSEMENT AND EQUITABLE LINES—

BURDEN OF PROOF AND QUANTUM OF EVIDENCE 193 (1997). Mrs. Capps failed to meet her burden here.

### 1. Repayment of $15,000 on Real Estate Contract

First, Mrs. Capps argues that the trial court erred by failing to reimburse the community for the $15,000 that Mr. Capps used to satisfy the home's real estate contract two months after their marriage, allegedly because Mr. Capps had used a portion of the later-acquired $42,500 loan to pay off this real estate contract. But at trial, Mrs. Capps testified that (1) Mr. Capps had over $80,000 in separate cash assets at the time of marriage; (2) this money was more than enough to pay off the real estate contract; and (3) the $42,500 loan proceeds that had gone into a "community account," were used for "community purposes," and *did not benefit Mr. Capps's separate estate*. RP (March 15, 2011) at 118, 123.

If both separate and community property funds are available and there are sufficient separate funds to pay a separate obligation, the court will presume that the payments for the separate obligation were made from the separate funds. *Pollock v. Pollock*, 7 Wn. App. 394, 404, 499 P.2d 231 (1972); *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 867, 855 P.2d 1210 (1993). The uncontroverted evidence at trial showed that Mr. Capps had sufficient separate property assets at the time of marriage to pay off his separate obligation on the real estate contract, and Mrs. Capps made no positive showing that any funds from the $42,500 loan were used to pay off the real estate contract. We hold, therefore, that the trial court did not err by declining to credit Mr. Capps's $15,000 real estate contract payoff amount to the community estate.

2.      Repayment of $42,500 Mortgage

Mrs. Capps argues that the trial court erred by failing to reimburse her for the contributions she had made to repay the $42,500 mortgage during the marriage.[11] Ms. Capps testified at trial that she and Mr. Capps had repaid the $42,500 mortgage with $350 monthly payments from community funds until the mortgage was fully repaid in 1991. But instead of establishing that the $42,500 was Mr. Capps's separate obligation or that loan proceeds benefited Mr. Capps's separate estate, Mrs. Capps testified on cross-examination that (1) the $42,500 loan was put into a community account and used for community purpose; (2) the marital community got the full benefit and use of the money, not Mr. Capps's separate estate; (3) the loan helped the community acquire over a million dollars in assets during the marriage; and (4) she *did not know if any of the loan proceeds had been used to refurbish the home.*

A court may impose an equitable lien to protect a person's right to reimbursement "whenever property of one of the three characters (separate property of husband, separate property of wife, or community property) is used to improve property of either of the other two sorts." *In re Estate of Trierweiler,* 5 Wn. App. 17, 22-23, 486 P.2d 314 (1971).[12]  Here, however, the undisputed trial evidence showed that Mr. Capps had used his separate property home, for which he had previously paid off the real estate contract and had acquired full

---

[11] In addition to the $350 monthly community property payments toward the $42,500 mortgage, Mrs. Capps also asserts that the trial court failed to credit her for her separate property contribution to the home because she and Mr. Capps fully repaid the mortgage in 1991 with money from her $75,000 separate property, personal injury settlement. But as we describe in more detail later, the trial court found her testimony to this effect not credible. And we do not review the trial court's credibility determinations. *In re Marriage of Rich,* 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

[12] *See also* WASHINGTON STATE BAR ASSOCIATION, WASHINGTON COMMUNITY PROPERTY DESKBOOK, 3-134 (3d ed. 2004).

ownership, merely as *collateral* for the $42,500 mortgage loan. Because the loan was acquired during the marriage, it was presumptively a community debt that would benefit the community.[13] Consistent with this presumption was Mrs. Capps's trial testimony that all of the loan proceeds were put into a community account, used by the community for community purposes, and benefited the community. Mrs. Capps made no positive showing that any of the loan proceeds were used to refurbish the home.

Mrs. Capps failed to show that her separate property or community property was used to improve Mr. Capps's separate home. Accordingly, she failed to prove her right to reimbursement for any funds used to pay off the $42,500 loan. We hold that the trial court did not err by failing to credit the community with this amount.

### 3. Increase in Home's Value from Inflation

Mrs. Capps also argues that the trial court erred by failing to reimburse her for the inflation value of her "proportionate contributions" to the home. Br. of Appellant at 40. As we explained above, we presume that any increase in the value of separate property resulting from inflation is also separate property absent "direct and positive evidence that the increase is *attributable to community funds or labors.*" *Elam*, 97 Wn.2d at 816 (emphasis added). "This rule entitles each spouse to the increase in value during the marriage of his or her separately owned property, except to the extent to which the other spouse can show that the increase was attributed to community contributions." *Elam*, 97 Wn.2d at 816-17. Again, Mrs. Capps offered

---

[13] Debt incurred by either spouse during marriage is presumed to be a community debt; the key test is whether, at the time the obligation was entered into, there was a reasonable expectation the community would materially benefit. *Sunkidd Venture, Inc. v. Snyder-Entel*, 87 Wn. App. 211, 215, 941 P.2d 16 (1997). Although a spouse may rebut this presumption with "clear and convincing evidence that the debt was *not contracted for community benefit,*" Mrs. Capps's trial testimony failed to rebut this presumption. *Sunkidd Venture*, 87 Wn. App. at 215 (emphasis added).

no evidence at trial about the specific improvements she and Mr. Capps had made to "refurbish" the home during their marriage or that such improvements were the reason the home had increased in value.[14] Therefore, she failed to overcome the presumption that increases in the home's value were Mr. Capps's separate property. We hold that the trial court did not err by failing to credit the community with this increased value amount.

### 4. Property Taxes during Marriage

Mrs. Capps also argues that the trial court erred by failing to reimburse her for $101,434.72 in property taxes (averaging $281.76 per month) that she and Mr. Capps paid for the home during their marriage, from 1977 to 2006. Though Mrs. Capps testified that these taxes were paid with community funds, she offered no documentary proof. The trial court rejected her testimony and found that her proof failed.[15] Credibility determinations are for the trier of fact, and we do not review those determinations or substitute our own judgment for the trial court's. *Rich*, 80 Wn. App. at 259. This claim fails for lack of proof.

### C. Imputed Rent during Marriage before Mr. Capps's Death

Mrs. Capps also argues that the trial court erred by (1) imputing to her $286,560 (approximately $840 per month) as the rental value of living in the home rent-free during her 30-year marriage to Mr. Capps and (2) offsetting this rental value against her equitable

---

[14] Mrs. Capps submitted two declarations as part of her pretrial motions, listing some of the improvements made to the home during marriage, but these declarations did not list the amount of money expended on these improvements or positively state that such improvements increased the value of the home. Mrs. Capps also submitted the declaration of real estate appraiser Jay Latteri with her motion for reconsideration. This declaration showed that the home was valued at $755,000, but it was not admitted as an exhibit at trial.

[15] "Even if Linda Capps had proven that those taxes were paid with community funds, which she did not, no right for reimbursement secured by an equitable lien would arise because the reasonable rental value received by the marital community for the use of Mr. Capps' home far exceeded the amount of property taxes paid." CP at 588 (CL V).

reimbursement claim and any contributions that she may have made to the home over the 30-year period, thereby negating her right to reimbursement. Because the trial court concluded that the community had no equitable reimbursement claim, we need not evaluate the trial court's conclusion regarding imputed rent as, in this circumstance, it amounts to a legal aside.

D. Rent and Other Expenses after Mr. Capps's Death

Mrs. Capps proved at trial that she had paid property taxes and expenses for the home after Mr. Capps's death. She introduced evidence that, after her husband died, she had paid $13,795.41 in property taxes on the home, $2,502 in home insurance, and $6,618.78 for new windows, resulting in a total expenditure of $22,916.19, which benefited Mr. Capps's separate estate.[16] The trial court credited Mrs. Capps for this entire $22,916.19 amount.

The trial court then offset this $22,916.19 amount against the reasonable rental value for the 32-month period that Mrs. Capps had lived in the home *after* Mr. Capps's death, which terminated the community, caused the home to pass to his separate estate, and made Mrs. Capps responsible for paying rent to his separate estate. The undisputed evidence at trial showed that the reasonable rental value for this period was $1,500 a month, for a total of $48,000. Subtracting Mrs. Capps's $22,916.19 credit for the taxes and expenses she paid from the $48,000 she owed in rent left her owing Mr. Capps's separate estate a balance of $25,083.81, which the trial court rounded up to $25,084. We hold that the trial court did not err by calculating this balance that Mrs. Capps owed to the estate for rent for the time she lived in the home after her husband died and ownership of the home had passed to his children.

---

[16] Mrs. Capps apparently also paid $1,660.20 for a new deck, $350 for exterior painting, $50 for new door locks, and $400 for a new garage door opener. The trial court did not reimburse her for these expenses because the deck failed and the other expenses would have been incurred by a tenant and should not be set off against rent. It was within the trial court's discretion to not reimburse her for these amounts.

III.    OTHER TRIAL COURT RULINGS

A.    Credibility

Mrs. Capps assigns error to the trial court's credibility determinations regarding several points of her testimony. Such credibility determinations are the exclusive province of the trial court; we neither review those determinations nor substitute our judgment for that of the trial court. *Rich*, 80 Wn. App. at 259. Thus, we do not review the trial court's credibility determinations here.

B.    Expert Testimony on Home's Value

Mrs. Capps also argues that the trial court erred by allowing Richmond's expert testimony about the reasonable rental value of living in the home both before and after Mr. Capps's death because Richmond was not qualified as an expert. To challenge a trial court's admission of evidence on appeal, a party must have raised a timely and specific objection at trial. *State v. Gray*, 134 Wn. App. 547, 557, 138 P.3d 1123 (2006). If a party fails to make such an objection at trial, she waives any evidentiary error on appeal. ER 103(a)(1); *State v. Black*, 109 Wn.2d 336, 340, 745 P.2d 12 (1987). Mrs. Capps did not object to Richmond's expert witness qualifications at trial or to his testimony about his real estate valuation methods. We hold, therefore, that she has waived this error on appeal.

IV.    ATTORNEY FEES

A.    Trial

Lastly, Mrs. Capps argues that the trial court abused its discretion in awarding attorney fees to Larry and Kimberly under RCW 11.96A.150 for the proceedings below. We disagree.

In probate matters, RCW 11.96A.150(1) gives the trial court discretionary authority to award attorney fees and costs to any party to the proceedings and "in such amount and . . .

manner as the court determines to be equitable." *In re Estate of Black*, 116 Wn. App. 476, 489, 66 P.3d 670 (2003). In exercising its discretion, the trial court may consider "any and all factors that it deems to be relevant and appropriate," including whether the litigation benefits the estate or trust involved. RCW 11.96A.150(1). We will not interfere with such a decision unless it is manifestly unreasonable or rests on untenable grounds or reasons. *Black*, 116 Wn. App. at 489.

Here, the trial court awarded attorney fees to Larry and Kimberly because Mrs. Capps's actions had caused Larry and Kimberly to endure protracted litigation over the separate or community property character of Mr. Capps's home, even after the trial court had repeatedly ruled against her on this issue based on the terms of her prenuptial agreement and the quitclaim deed. Mrs. Capps then commenced other actions, including a claim against Larry and Kimberly personally, and pursued her equitable reimbursement claim to trial, even though she lacked the requisite evidentiary support for her claim. Mrs. Capps's action increased attorney fees and costs for Larry and Kimberly and perhaps even to the estate in defending the probate distribution. Based on these facts, we hold that the trial court acted within its broad discretion in awarding attorney fees and costs to Larry and Kimberly for the proceedings below.

B.     Appeal

Larry and Kimberly also request attorney fees on appeal under RCW 11.96A.150. RAP 18.1(a), (b) allows us to award reasonable attorney fees where, as here, a statute provides for such fees and the parties request the fees in a separate section of their opening brief. *Dice v. City of Montesano*, 131 Wn. App. 675, 693, 128 P.3d 1253 (2006). Although recognizing our discretion under RCW 11.96A.150 to award attorney fees and costs as we deem equitable, we decline to award further attorney fees and costs in this case.

23

42078-3-II

We hold that the trial court (1) did not err by concluding that the home was Mr. Capps's separate property and that it passed to Larry and Kimberly under Mr. Capps's will at his death (2) and did not err by ruling that Mrs. Capps's evidence was insufficient to prove her claims for equitable reimbursement for separate and community property contributions to the home before Mr. Capps's death. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Penoyar, J.

We concur:

Hunt, J.

Armstrong, J.P.T.

24